*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 04a0387p.06

# UNITED STATES COURTS OF APPEALS

## FOR THE SIXTH CIRCUIT

WILLIAM SINGFIELD,

*Plaintiff-Appellant,*

*v.*

No. 03-3735

AKRON METROPOLITAN HOUSING AUTHORITY, et al.,
*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 02-01706—James S. Gwin, District Judge.

Argued: August 10, 2004

Decided and Filed: November 10, 2004

Before: KEITH, MARTIN, and ROGERS; Circuit Judges.

_____

## COUNSEL

**ARGUED:** Edward L. Gilbert, SLATER, ZURZ & GILBERT, Akron, Ohio, for Appellant. Vincent J. Tersigni, BUCKINGHAM, DOOLITTLE & BURROUGHS, Akron, Ohio, for Appellees. **ON BRIEF:** Edward L. Gilbert, SLATER, ZURZ & GILBERT, Akron, Ohio, for Appellant. Vincent J. Tersigni, Ashley M. Manfull, BUCKINGHAM, DOOLITTLE & BURROUGHS, Akron, Ohio, for Appellees.

MARTIN, J., delivered the opinion of the court, in which KEITH, J., joined. ROGERS, J. (p. 10), delivered a separate dissenting opinion.

_____

## OPINION

_____

BOYCE F. MARTIN, JR., Circuit Judge. William Singfield, an African-American male, appeals the district court's grant of summary judgment to the Akron Metropolitan Housing Authority on his claims of racial discrimination, retaliation, and due process and equal protection violations.[1] Singfield alleges that the Akron Metropolitan Housing Authority violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., and Chapter 4112 of the Ohio Revised Code, by terminating his employment for racially-motivated reasons and retaliating against him after he filed charges of racially-discriminatory treatment. Singfield alleges under 42 U.S.C. § 1983 that the Housing Authority and its executive director, Anthony

---

[1]Singfield also appeals two pre-trial discovery rulings. However, because these claims are untimely under Rule 72(a) of the Federal Rules of Civil Procedure, we do not address them.

O'Leary, deprived him of his constitutional rights to due process and equal protection. We conclude that Singfield has presented genuine issues of material fact with regard to whether the Housing Authority deprived him of procedural due process and retaliated against in him in violation of Title VII. Therefore, we reverse the judgment in part. As to the other claims, the district court properly concluded that no genuine issues of fact remain and the defendants are entitled to judgment as a matter of law.

## I.

Akron Metropolitan Housing Authority is a public agency chartered by the State of Ohio and funded by the United States Department of Housing and Urban Development to provide subsidized housing for eligible citizens of Summit County, Ohio. Singfield began full-time employment with the Housing Authority in June of 1992. During his tenure, Singfield worked as a courier, janitor, painter, and, finally, maintenance worker, the position from which he was suspended on August 9, 2001, and terminated on January 25, 2002. His suspension, according to the Housing Authority, resulted from a long history of improper outbursts at work that culminated in a disagreement on August 8 with his supervisor, Mike Reinhart, after which Singfield was escorted from the premises. Also, later that day, Reinhart found six duplicate master keys on Singfield's key ring. The Housing Authority's "master key policy" prohibits non-management employees such as Singfield from having duplicate keys and subjects those who violate the policy to graded forms of discipline.[2]

On August 9, Human Resources Director Christine Yuhasz met with Singfield and a union representative to discuss the previous day's events. The Housing Authority states that Singfield acknowledged the altercation but denied any responsibility, and that Singfield said he knew nothing about the duplicate keys on his key ring. They had a follow-up meeting on August 17, where they discussed those same events and recent rumors, which Singfield denied, that he once attempted to kill a former supervisor. On August 21, the Housing Authority sent Singfield a letter of suspension, which included the following statement:

> This letter is to confirm our conversation earlier today, that you are being placed on a minimum thirty day unpaid suspension, effective Wednesday, August 22, 2001. You are also required to seek assistance for anger management, either through AMHA's Employee Assistance Program or through a qualified individual of your choice.

> The reason for this suspension is due to an incident which occurred on August 8, 2001. After an altercation with your supervisor, Michael Reinhart, in a unit at 124 Colonial Hills, you were sent home for the day. Your keys were found hanging from the lockbox. After examining the keys it was found that six of the keys were duplicated master keys. Unauthorized duplication of master keys is forbidden according to AMHA policy.

> The altercation with Mr. Reinhart was one of several such altercations between you and your supervisors, as well as with fellow employees during your employment with AMHA. It is expected that you will participate in some type of treatment for anger management while serving your suspension. You will be required to provide proof of treatment in order to be permitted to return to work, and as a condition of employment. If the professional who helps you manage your anger feels that it will take longer than thirty days, your suspension will be extended until such time as he/she recommends your return to work.

---

[2]General disciplinary action for non-compliance with the master key policy is as follows:

*First Offense*  -A letter of reprimand will be placed in the employee's file.
*Second Offense*  -Suspension without pay for a period of three work days.
*Third Offense*  -Termination of employment with AMHA.

From this letter, it is clear that the Housing Authority suspended Singfield for engaging in the August 8 altercation with Reinhart and other "such altercations," and for violating the Housing Authority's "master key policy."

Singfield acknowledges that he was disciplined at times throughout his employment with the Housing Authority. In May 1994, the Housing Authority suspended Singfield for three days because he engaged in a verbal confrontation with two tenants and failed to neutralize the situation. In August of 1995, the Housing Authority suspended Singfield for five days after he engaged in a verbal confrontation with a co-worker, Shelia Fambro, who received one day of suspension for the incident. Work evaluations from 1998 and 1999 cite Singfield's need to improve in the "Relationships With Others" category and in his conduct and cooperation with supervisors and co-workers. Finally, Executive Director Anthony O'Leary had several conversations with Singfield in 2000 regarding his problems with supervisors. After the August 1995 suspension, Singfield did not have a record of any disciplinary problems for seven years, until the August 8, 2001, altercation with Reinhart.

During Singfield's suspension, some of his co-workers approached the Housing Authority management with concerns about working with him. Reinhart told Yuhasz that he feared Singfield, and that Singfield had previously told him that he had once hoped to kill a former supervisor, but that after waiting in the snow outside his former supervisor's house his hands had grown too cold to pull the trigger. Yuhasz has stated that she was also informed by a supervisor and a union steward that several employees feared Singfield and did not want him to return to work; these employees reported that they heard he had attempted to kill a former supervisor and that his family has a history of violence.

After a few weeks of treatment with a counselor affiliated with the Housing Authority's Employee Assistance Provider, the counselor indicated to the Housing Authority a willingness to release Singfield to return to work. The Housing Authority balked, and then informed the counselor of Singfield's history of anger management, the incidents that occurred during Singfield's employment, and the rumors about his family history of violence. The counselor then referred Singfield to a psychologist, who did not release Singfield to return to work. Knowing that the counselor would have released him but for the Housing Authority's interference, Singfield filed a discrimination claim with the Equal Employment Opportunity Commission in October 2001.

The Housing Authority terminated Singfield's employment on January 25, 2002. The termination letter stated:

> Pursuant to the collective bargaining agreement between The Akron Metropolitan Housing Authority and Ohio Council 8 of the American Federation of State, County and Municipal Employees and Local No. 2517, this is to notify you that your employment with The Akron Metropolitan Housing Authority is being terminated as of today.
>
> This termination is a result of information we have obtained during the investigation we have conducted since the time of your suspension. We have learned of threats of violence to and intimidation of employees, temporary employees, managers, and tenants by you. In addition, we have learned of attempted acts of violence toward employees by you. As a result of these findings, we must terminate your employment to avoid any further risk of any potentially violent situations that could result in harm to our employees.

Singfield subsequently filed this lawsuit.

## II. Standard of Review

We review *de novo* the district court's grant of summary judgment. *Newman v. Federal Exp. Corp.*, 266 F.3d 401, 404 (6th Cir. 2001). Summary judgment is appropriate where the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

law." FED. R. CIV. P. 56( c). In deciding an appeal of a grant of summary judgment, we view the evidence and draw all reasonable inferences in favor of Singfield, the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). We weigh the evidence not to determine the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists when there is sufficient evidence on which the jury could reasonably find for Singfield. *Id*. at 252.

### III.  Title VII

Singfield alleges that the Housing Authority violated Title VII by discharging him based on his race and in retaliation for Singfield's charges of discrimination. The Housing Authority states that it discharged Singfield for engaging in threats of violence, intimidating its employees and tenants, and violating its "master key policy." Finding that Singfield presented no genuine issue of material fact and that the Housing Authority was entitled to judgment as a matter of law, the district court granted the Housing Authority's motion for summary judgment.

  *A.*  *Discrimination under Title VII and the Ohio Revised Code*

Because federal case law governing Title VII actions is generally applicable to discrimination claims under Ohio law, we analyze Singfield's race discrimination claim in terms of federal law. *See Little Forest Med. Ctr. v. Ohio Civil Rights Comm'n*, 575 N.E.2d 1164 (Ohio 1991) ("'reliable, probative, and substantial evidence' in an employment discrimination case brought pursuant to [Ohio Revised Code] Chapter 4112 means evidence sufficient to support a finding of discrimination under Title VII") (quoting *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128 (Ohio 1981)). Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §§ 2000e-2(a)(1) (1994). Singfield may establish a prima facie case under Title VII for racial discrimination by introducing direct evidence of discrimination or by using the *McDonnell-Douglas* burden-shifting paradigm. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997) (citing *Talley v. Bravo Pitino Rest.*, *L.T.D.*, 61 F.3d 1241, 1248 (6th Cir. 1995). Singfield fails under both standards.

As direct evidence of discrimination, Singfield asserts that he "received the dirtiest and hardest assignments while white employees were allowed to lounge, play cards[,] and read the newspaper." He also asserts that he "was forced to drive a lawn mower, instead of a truck, . . . unlike white employees," but he provides no proof to support these allegations and his articulations do not suffice. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n. 9 (1981) ("[a]n articulation not admitted into evidence will not suffice. Thus, the defendant cannot meet its burden merely . . . by argument of counsel"). Singfield also argues that Reinhart made "racially derogatory remarks" to him. He says that while he was driving a tractor, Reinhart called out, "Now all you need is to turn the lights on and wear a straw hat." Such teasing does not rise to the level of a constitutional violation. The Supreme Court has held that "simple teasing" or "offhand comments, and isolated incidents" do not amount to direct evidence of discrimination under Title VII. *Fara v. City of Boca Raton*, 524 U.S. 775, 788 (1988), *accord Hafford v. Seidner*, 183 F.3d 506, 512-16 (6th Cir. 1999). The district court properly found that these complaints, "even if true, do not amount to direct evidence of racial discrimination."

The *McDonnell-Douglas* paradigm requires Singfield to show inferential and circumstantial evidence from which a jury could draw an inference of discrimination. *Kline*, 128 F.3d at 348. In doing so, Singfield must show the following: (1) that he is a member of a protected group; (2) that he was subject to an adverse employment action; (3) that he was qualified for the position from which he was fired; and (4) that he was treated differently than employees outside of the protected class for the same or similar conduct. *Talley*, 61 F.3d at 1246 (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)).

Singfield, without dispute, satisfies the first three elements. The fourth element is more difficult, and may be satisfied by showing that similarly situated non-protected employees were treated more favorably. *Mitchell*, 964 F.2d at 582-83. Singfield argues that the Housing Authority disciplined him more severely than other employees who violated the key policy or exhibited threatening or violent behavior. Other employees who violated the key policy include: John Stock, a white janitor who was suspended for three days for duplicating one master key, which accessed an area in which Stock worked, without authorization; and Virgil Arnes, a white maintenance worker who was given a written reprimand ten years prior to the events leading to this case for leaving a master key in his assigned vehicle overnight. Other employees who exhibited threatening or violent behavior include: Tom Spurlock, who allegedly threw a toilet seat at Reinhart and received no discipline; Ronald Feinman and Dan Caporuscio, who allegedly engaged in a fist-fight at work that was witnessed by a supervisor but did not subject either man to discipline; and John Herrick, an employee who allegedly made physical threats to his supervisor during a holiday party thirteen years prior to the events leading to this case. Of the examples that Singfield cites, the district court found that no employee was similarly situated to Singfield because in each example the employee worked in a different job, had a different supervisor, and committed less significant offenses or no documented offense at all.

As this Court first explained in *Mitchell*, "[i]t is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly situated *in all respects*." 964 F.2d at 583 (emphasis in original). We further stated, in *Ercegovich v. Goodyear Tire and Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998), that "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;' rather . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the relevant aspects.'" In *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000), we reasserted that "in applying [this] standard courts should not demand exact correlation, but should instead seek relevant similarity." Applying the principles set forth in *Mitchell*, *Ercegovich*, and *Perry*, we conclude that, although the co-workers to which Singfield compares himself may have similarities in some respects, none was similar in the way that is fundamental to this case: no employee violated the key policy *and* engaged in threatening or violent behavior. Because none of the employees cited allegedly engaged in the range of activities for which Singfield was disciplined, no employee is similarly situated.

By failing to satisfy the fourth element, Singfield fails to establish a prima facie case of discrimination under Title VII. Therefore, the district court properly dismissed the claim.

B.       *Title VII Retaliation Claim*

Singfield claims that the Housing Authority fired him because he filed a discrimination claim with the Equal Employment Opportunity Commission. Title VII makes it unlawful for an employer "to discriminate against any . . . employee or applicant . . . because [the employee] has opposed any practice, made an unlawful employment practice by this sub chapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this sub chapter." 42 U.S.C. §§ 2000e-3(a) (1994). In order to meet the prima facie standards for a retaliation claim, Singfield must establish that: (1) he engaged in activity protected by Title VII, (2) the Housing Authority had knowledge of his exercise of his civil rights, (3) the Housing Authority subjected him to an adverse employment action, and (4) a causal connection exists between the protected activity and the adverse employment action. *Harrison v. Metro. Gov't*, 80 F.3d 1107, 1118 (6th Cir. 1996) (citing *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987).

At the summary judgment stage in retaliation cases, the order of proof and shifting of burdens is viewed in light of the traditional summary judgment test. *Foster v. Arcata Assocs., Inc.*, 772 F.2d 1453, 1459 (9th Cir. 1985), *cert. denied*, 475 U.S. 1048 (1986). Singfield need not prove his prima facie case by a preponderance of the evidence at this stage. *Foster*, 772 F.2d at 1459. Indeed, the burden of establishing

the prima facie retaliation case is easily met. *See Avery*, 104 F.3d at 861. Singfield establishes the first three elements without dispute. The fourth element is more difficult. To prove a causal connection, Singfield must produce sufficient evidence from which an inference can be drawn that the Housing Authority took the adverse employment action because Singfield filed a discrimination charge. *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (citations omitted). "Although no one factor is dispositive in establishing a causal connection, evidence . . . that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000); *see also Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 110 (1st Cir. 1988) (employee's discharge "soon after" engaging in protected activity "is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation."); *Miller v. Fairchild Indus., Inc.*, 797 F.2d 731 (9th Cir. 1986) ("Causation sufficient to establish a prima facie case of unlawful retaliation may be inferred from the proximity in time between the protected action and the allegedly retaliatory discharge."). Singfield submits that he was terminated on January 25, 2002, just over three months after he filed a discrimination charge with the employment commission. He argues that from such temporal proximity we should infer a retaliatory motive. We agree, and conclude that the temporal proximity of these events is significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying Singfield's burden of demonstrating a prima facie case. *See Hochstadt v. Worcester Found. for Experimental Biology, Inc.*, 425 F.Supp. 318, 324-25 (D. Mass), *aff'd* 545 F.2d 222 (1st Cir. 1976) (to establish a prima facie case, plaintiff must show that her discharge followed her protected activities within such period of time that the court can infer retaliatory motive; plaintiff's discharge six months after EEOC settlement satisfies the causation requirement).

Because Singfield establishes the prima facie case, the burden of production shifts to the Housing Authority to articulate a legitimate, non-retaliatory explanation for the action. *Wrighten v. Metro. Hosps., Inc.*, 726 F.2d 1346, 1354 (9th Cir. 1984). To satisfy this burden, the Housing Authority "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine*, 450 U.S. at 257. The Housing Authority submits Singfield's history of altercations, statements that he made to other employees regarding his attempt to kill a former supervisor, and the psychologist's decision not to release him to return to work. With this evidence, the Housing Authority successfully rebuts the inference of retaliation, and the burden shifts once again to Singfield to show that the proffered explanations are merely pretext for discrimination. *Wrighten*, 726 F.2d at 1354.

"A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Lewis v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). Singfield claims that the Housing Authority did not begin investigating him in earnest until he filed the discrimination charge in October. He argues that the Housing Authority's reasons—his history of altercations and the alleged statements—for terminating his employment were pretextual because the Housing Authority would not have discovered them without retaliating. In other words, the Housing Authority's retaliation, which began with its investigations after Singfield filed his discrimination charge in October, culminated in its termination of his employment in January. He also argues that the Housing Authority's third reason—the psychologist's refusal to release him to return to work—is pretextual because his counselor intended to release him but was prohibited from doing so by the Housing Authority.

Courts have recognized that in discrimination and retaliation cases, an employer's true motivations are particularly difficult to ascertain, *see United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983) (acknowledging that discrimination cases present difficult issues for the trier of fact, as "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes"), thereby frequently making such factual determinations unsuitable for disposition at the summary judgment stage, *Lowe v. City of Monrovia*, 775 F.2d 998, 1009 (9th Cir. 1985) (stating that very little additional evidence is required to raise a genuine issue of fact regarding motive, and concluding that summary judgment on the merits is ordinarily inappropriate once a prima facie case has been established). Several of our sister circuits have

urged caution in granting summary judgment once the plaintiff has satisfied the prima facie case. They have concluded that once a prima facie case is established either by the introduction of direct evidence or reliance on the *McDonnell Douglas* presumption, summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of a Title VII dispute is the "elusive factual question of intentional discrimination," *Burdine*, 450 U.S. at 255 n. 8. *See, e.g.*, *Foster*, 772 F.2d at 1459 (courts generally cautious about granting summary judgment in Title VII cases where intent is involved); *Sweat v. Miller Brewing Co.*, 708 F.2d 655, 657 (11th Cir. 1983) ("'granting of summary judgment is especially questionable'" in employment discrimination cases (quoting *Hayden v. First Nat'l Bank*, 595 F.2d 994, 994 (5th Cir. 1979))); *McKenzie v. Sawyer*, 684 F.2d 62, 67 (D.C. Cir. 1982) (factual disputes in most Title VII cases preclude summary judgment). We agree that caution should be exercised in granting summary judgment once a plaintiff has established a prima facie inference of retaliation through direct or circumstantial evidence.

The Housing Authority's true reasons for discharging Singfield present an "elusive factual question," *Burdine*, 450 U.S. at 255 n. 8, incapable of resolution on summary judgment. In light of Singfield's argument that the temporal proximity of the discrimination charge and his termination gives rise to an inference of retaliation, we conclude that he has satisfied the sufficiency standard at the summary judgment phase. Though Singfield may fail at trial to establish his Title VII retaliation claim under the preponderance of the evidence standard, the district court erred in dismissing the Title VII retaliation claim at this stage.

## IV. Constitutional Claims

### A.　　Due Process Claim

The fourteenth amendment's guarantee of procedural due process assures that the deprivation of life, liberty, or property "be preceded by notice and opportunity for a hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1986); *see also Lee v. W. Reserve Psychiatric Habilitation Ctr.*, 747 F.2d 1062, 1067 (6th Cir. 1984). Singfield argues that he was provided neither. To resolve this claim, we engage in a two-step analysis: we determine initially whether a protected property interest exists and then what procedures are required to protect that interest. *Johnston-Taylor v. Gannon*, 907 F.2d 1577, 1581 (6th Cir. 1990).

Singfield concedes that, as an unclassified civil service employee, he held no statutory right under Ohio law to continued employment. *See, e.g.*, *Vodila v. Clelland*, 836 F.2d 231 (6th Cir. 1987); *accord Christophel v. Kulinksy*, 61 F.3d 479, 482 (6th Cir. 1995). However, he argues that such right was provided to him through contract by the language of the Housing Authority's Employment Handbook and the collective bargaining agreement that he entered into through his union with the Housing Authority. In addition to the contractual right, Singfield argues that his property right also derived from his "objective expectations of entitlement." These are 1) his expectation that he "would not be terminated without a pre-termination hearing, because no one had been terminated without a pretermination hearing for [twenty-five] years," and 2) that he would not be fired as long as he complied with the terms of his suspension—i.e., obtained anger management counseling. The district court found that Singfield failed to establish a statutory property right in continued employment at the Housing Authority, and that, even if he did have a property interest through a contract or implied terms of agreement, the Housing Authority satisfied all of the pre-termination process that was due. We disagree. Singfield had a property right pursuant to the terms of the collective bargaining agreement and has raised a genuine issue of material fact as to whether the Housing Authority provided him due process. Because we conclude that Singfield had a property right through contract, we need not address his arguments for an implied right based on his objective expectations of entitlement.

Property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents v. Roth*, 408 U.S. 564 (1972). A

property interest can be created by a state statute, a formal contract, or a contract implied from the circumstances. *See Perry v. Sindermann*, 408 U.S. 593, 602 (1972); *Bailey v. Floyd County Bd. of Educ. By and Through Towler*, 106 F.3d 135, 141 (6th Cir. 1997); *Woolsey v. Hunt*, 932 F.2d 555, 564 (6th Cir. 1991). Singfield's collective bargaining agreement with the Housing Authority states:

> **Section 3.** - Discharge/Suspension. No employee shall be discharged or suspended without just cause. The degree of discipline administered will depend on the nature and seriousness of the offense and the employee's past record of discipline and performance. Discipline will normally be applied in a progressive manner except in cases of severe violations of AMHA policies.

As stated, the Housing Authority explicitly agreed to discharge its employees only for just cause. This agreement vests in Singfield the necessary property interest in continued employment. *See Brock v. Roadway Express, Inc.*, 481 U.S. 252, 260-61 (1987) (holding that a private contractual right can constitute a property interest entitled to due process protection); *Jefferson v. Jefferson County Pub. Sch. Sys.*, 360 F.3d 583, 587 (6th Cir. 2004) (collective bargaining agreement between the teachers' union and the school board grants plaintiff a property interest in continued pay and benefits because it provides that a teacher may only be suspended for "just cause"). Thus, we must determine whether the Housing Authority satisfied its due process obligations.

In discussing what process is sufficient, the *Loudermill* Court stated that the employee must be given notice of the charges against him, an explanation of the employer's evidence, and a chance to present his side of the story. 470 U.S. at 532. Of course, the pre-termination hearing need not be a full evidentiary, adjudicatory hearing; the notice and pre-termination hearing requirements seek only to ensure that there is a reasonable basis to believe that the charges against the employee are true. *Duchesne v. Williams*, 849 F.2d 1004, 1007 (6th Cir. 1988). The district court found that Singfield's August 9 and August 17 pre-suspension hearings satisfied any procedural due process requirements relating to his termination. We disagree.

Singfield was notified and given an explanation of the charges giving rise to his suspension, but he was not notified or given an explanation of the charges giving rise to his termination. In his pre-suspension hearing, Singfield heard and contested only those charges relating to the Housing Authority's master key policy and his August 8 altercation with Reinhart. After it suspended Singfield, the Housing Authority gathered new information that, by its own admission, caused it to terminate Singfield's employment. Yet the Housing Authority did not give him a distinct opportunity address that information prior to his termination. Singfield effectively argues that because his termination was, as the Authority states, for reasons discovered after his suspension and was not accompanied by distinct notice or a hearing, the Housing Authority violated procedural due process requirements. These facts as Singfield presents them create a genuine issue as to whether he was given notice, an explanation, and a chance to contest the charges leading to his termination. Thus, we conclude that Singfield's due process claim survives summary judgment.

### B.      Equal Protection Claim

Singfield claims under 42 U.S.C. § 1983 that the Housing Authority violated his constitutional right to equal protection. "To prove a violation of the equal protection clause under section 1983, [a plaintiff] must prove the same elements[—e.g., that he was treated differently than similarly situated employees—]as are required to establish a disparate treatment claim under Title VII, i.e., under the *McDonnell Douglas/Burdine* framework." *Lautermilch v. Findlay City Schs.*, 314 F.3d 271, 275 (6th Cir.) (quoting *Jachyra v. City of Southfield*, No. 95-1009, 1996 WL 520795, at *3 (6th Cir. Sept. 12, 1996)), *cert. denied*, No. 02-1619, 2003 WL 21134053 (Oct. 6, 2003). As discussed above, Singfield fails to establish that he was treated differently than similarly situated employees. He submits no new evidence to support his equal protection claim. Thus, the district properly dismissed the claim.

#### C.        *Constitutional Claims against O'Leary*

Singfield also filed due process and equal protection claims against Executive Director O'Leary. In response, O'Leary claims qualified immunity, which affords government officials an immunity from suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, we must resolve two issues: 1) whether Singfield suffered a deprivation of his clearly established constitutional rights; and 2) whether O'Leary acted in an objectively unreasonable manner in light of the clearly established constitutional rights. *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998). Because there has been no equal protection violation as explained above, we do not address qualified immunity for that claim. However, we conclude that Singfield creates a triable issue as to whether he had a constitutional right of which the Housing Authority deprived him and that genuine issues remain as to whether O'Leary acted reasonably in allowing the alleged violation. Because genuine issues of material fact remain as to both elements of the qualified immunity defense, the defense fails at the summary judgment stage.

Singfield satisfies, for summary judgment purposes, the first prong of our analysis, because, as discussed, he has presented triable issues of fact with respect to the alleged procedural due process violation. At the time Singfield was terminated, the law clearly allowed that property rights could be created by mutual understandings between the parties. *Perry*, 408 U.S. at 601. Singfield has presented evidence sufficient to create a triable issue with respect to whether the parties mutually agreed, in the collective bargaining agreement, to give Singfield a property interest in continued employment, and, thus, whether he had a right to a hearing. He has also presented evidence that he was terminated without a hearing. Therefore, Singfield's claim of procedural due process deprivation satisfies the first prong of the qualified immunity analysis.

Singfield satisfies the second prong because he presents evidence that it was generally understood that employees in Singfield's position were entitled to a hearing before their positions were terminated. *See Gratsch v. Hamilton County*, 12 Fed. Appx. 193, 206 (6th Cir. 2001) (unpublished) (holding that if there is a general understanding that certain employees were entitled to a hearing before their positions were terminated, then an objectively reasonable official would not believe that the employee could be terminated without a hearing, and employer is not entitled to qualified immunity). Singfield claims that O'Leary understood that employees in Singfield's position must receive a pre-termination hearing based on general knowledge that "[f]or [twenty-five] years, not one terminated employee had ever been denied a pretermination hearing at AMHA." Neither the Housing Authority nor O'Leary present evidence, whatever it might be, that O'Leary did not share such understanding. A fact-finder may conclude that an objective reasonable official would not have allowed the termination of Singfield's position without a pre-termination hearing at which Singfield could contest the findings of the post-suspension investigations. Any determination of the reasonableness of O'Leary's actions in terminating Singfield without a hearing depends on the resolution of the factual dispute over past practice and the general understanding of Housing Authority employers. Because Singfield has succeeded in making this a triable issue, it is premature to grant O'Leary's claim for qualified immunity at the summary judgment stage.

#### V.

For the foregoing reasons, we reverse the district court's judgment on Singfield's retaliation and due process claims, and O'Leary's qualified immunity claim. As to all other claims, we affirm.

———————————

**DISSENT**

———————————

ROGERS, Circuit Judge, dissenting.  Because in my view the district court properly granted summary judgment on the procedural due process claim, I respectfully dissent from Part III.A. of the majority opinion.  "Due process is a flexible principle whose requirements depend on the facts of the individual case." *Leary v. Daeschner*, 228 F.3d 729, 743 (6th Cir. 2000). Due process does not require that all bases for a final decision to terminate be part of an initial decision to suspend.  Once an employee has been suspended without a due process violation, his property interest is lessened.  His interest is not in staying employed, but in returning to work.  "Termination" in this context is merely a formal date, as the employee is working neither before nor after that date.  In such a context a "post-termination" hearing may well be sufficient to satisfy the requirements of due process. *See Mathews v. Eldridge*, 424 U.S. 319, 339-43 (1976); *cf. Collyer v. Darling*, 98 F.3d 211, 223-24 (6th Cir. 1996).  Indeed, it appears to be sufficient in this case.  The suspension letter given to Singfield not only informs Singfield that he was being suspended for the unauthorized duplication of master keys and altercation with Reinhart, but also informs him that the Housing Authority had concerns regarding  "several [other] altercations between you and your supervisors, as well as with fellow employees."  Singfield thus was "faced with charges that a reasonable person would recognize as jeopardizing an employment future." *Buckner v. City of Highland Park*, 901 F.2d 491, 495-96 (6th Cir. 1990).  The process Singfield received therefore satisfies the flexible requirements of procedural due process.

At the very least, qualified immunity is warranted for Mr. Reinhart on the due process issue.  Even if due process should extend to requiring that validly suspended employees get the same "pre-termination" hearing that working employees get, there has been no demonstration that such a requirement is "clearly established." *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).